**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **AETNA LIFE INSURANCE CO.,** | § | |
| | § | **JURY DEMANDED** |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:12-cv-1206** |
| | § | |
| **HUMBLE SURGICAL** | § | |
| **HOSPITAL, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## AETNA'S ORIGINAL COMPLAINT

Aetna Life Insurance Company files this Original Complaint ("Complaint") against Defendant Humble Surgical Hospital, LLC, and would respectfully show the Court as follows:

**I.**
**PARTIES**

1.     Plaintiff Aetna Life Insurance Company ("Aetna") is a corporation organized under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

2.     Defendant Humble Surgical Hospital, LLC ("HSH LLC") is a Texas limited liability company with its registered office at 5120 Woodway Drive, Houston, Harris County, Texas, and a citizen of the State of Texas.  Humble Surgical Hospital ("HSH" or the "Center") is a multi-specialty surgery center located at 1475 FM 1960 East Bypass, Humble, Harris County, Texas.  HSH LLC's registered agent for service of process is K&S Consulting, LLC, 5120 Woodway Drive, Suite 7012, Houston, Texas.

## II.
### JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over HSH LLC which is a Texas limited liability company doing business in Texas.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.     Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws or treaties of the United States.

6.     Venue is proper in the Southern District of Texas pursuant to 29 U.S.C. § 1132(e)(2) and § 1391(b)(1) because HSH LLC resides or may be found in this judicial district and pursuant to 29 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred here.

## III.
### FACTUAL BACKGROUND

7.     Aetna brings this action for common law fraud, money had and received, unjust enrichment and alternative equitable relief under the Employee Retirement Income Security Act ("ERISA") for injuries suffered as a result of the excessive and unreasonable fees charged by the Center, a "non-participating" (*i.e.*, non-contracted) surgical hospital owned or leased by HSH LLC.  Pursuant to the scheme described hereafter, the Center sought and received millions of dollars in exorbitant fees from

Aetna by charging fees far higher than the reasonable charges for the same services in the relevant market.

8.      HSH LLC, through its owner-physicians, is financially abusing Aetna members via referrals to the Center's out-of-network facilities in which the referring physicians have a financial ownership.  The Center in turn charges outrageous fees for **outpatient services** (*i.e.*, no overnight stay) that are many times more than the appropriate market rates.  All of this is accomplished without the Center or its owners informing the patient of the various financial incentives that could affect the type and level of care the patient receives.  Moreover, the Center and its physician-owners ignore standard ethical obligations to the patients by further failing to disclose the economic interest and potential gain that the Center obtains from the patient's out-of-network referral.

9.      For example, on one occasion, the Center charged Aetna $99,750 for an outpatient procedure which was described as ear wax removal.  But, this example of gross abuse is not an isolated incident – far from it.  The Center also charged Aetna $82,653 for "nose surgery," a procedure that reputable in-network hospitals would charge a small fraction to perform.  Additional examples of the Center's bloated bills demonstrate a pattern of egregious financial abuse that has been regularly levied upon Aetna members by the Center:

| Outpatient Procedure | Center's Charges |
|---|---|
| Disc Surgery | $138,000 |
| Lumbar Surgery | $150,000 |
| Hammertoe Surgery | $80,000 - $139,000 |
| Bunion Removal | $46,000 - $74,000 |
| Adenoid Removal | $92,000 |
| Hemorrhoids Removal | $11,000 |

Simply put, the Center is involved in a scheme to gouge the health care system, Aetna, and its members out of millions of dollars.  The Center is an example of greed over need and its abuse must be stopped.  Among the relief sought by Aetna is a declaration of the Center's wrongful billing practices and an injunction to assure that the Center cannot balance bill members for the outrageous balance bills created by its billing scheme.

10.    The scheme, sometimes referred to as an "out-of-network strategy," is implemented when ambulatory surgery centers or other purportedly specialized facilities like the Center target and siphon off high-value patients from in-network, full-service hospitals.  The target patients include those whose health benefit plans and policies of insurance provide ready access to out-of-network benefits for services rendered by non-participating providers such as the Center.

11.    Ordinarily, an Aetna member's utilization of an "out-of-network" hospital rather than a "participating" or "in-network" hospital, would result in higher out-of-pocket costs to the patient.  To encourage patients to use the Center rather than a participating hospital, the Center has in the past assured patients that they will only owe the remaining portion of any in-network deductible or will otherwise not be subject to higher out-of-pocket costs.  After admission, the Center submits exorbitant fee requests to Aetna, such as the referenced bill for $99,750 for the removal of ear wax, that it would not be able to submit were it a participating or in-network hospital.

12.    The Center's billed charges for some procedures are *up to ten times* higher than the usual, customary and reasonable fees of reputable hospitals in the same market.  The disparity in fees can be even more excessive when compared to the

discounted rates charged for the same services by an in-network hospital.   For example, surgery costing $18,500 at an in-network hospital with no out-of-pocket cost to the patient could cost $185,000 at the Center, a substantial portion of which ordinarily would be the patient's responsibility.   Where sidebar "deals" are made with the patient to waive patient out-of-pocket costs as an inducement to choose the Center over a reputable, in-network facility, the Center reaps a substantial windfall.

13.   Aetna brings this action under state and federal law for the disgorgement of these excessive fees and for other damages as set forth more particularly herein.

### The Health Care Benefits Provided By Aetna

14.   Aetna provides access to coverage and benefits to beneficiaries pursuant to a variety of health care benefit plans and policies of insurance, including (i) self-funded plans for which Aetna provides various third-party claims administrative services, (ii) plans insured under group policies issued by Aetna where plans are established and maintained by private employers, (iii) plans covering federal employees, (iv) plans covering employees of state governmental entities (v) church plans, and (vi) policies issued to individuals.   The governmental plans include those established by Harris County, Texas and the Teachers Retirement System of Texas.

15.   Aetna's benefit plans provide covered benefits for in-network services rendered by participating hospitals or surgical centers having contracts with Aetna or its affiliates.   Aetna's plans also provide covered benefits for out-of-network services rendered by non-participating hospitals or surgery centers which have not contracted with Aetna.   For each patient-beneficiary under this arrangement, the Center seeks money from Aetna for its fees, which it is now apparent are submitted regularly to "gouge" and abuse the system.

### In-Network Benefits By Participating Providers

16.     Aetna provides in-network health care benefits to its subscribers through a network of "participating" medical providers who have entered into contracts with Aetna to render services to subscribers in return for fees set by the terms of the contract.

17.     Medical providers who enter into contracts with Aetna are commonly known as participating providers, and the contracts between Aetna and participating providers require the participating provider to accept negotiated payment for services as payment in full and prohibit the provider from seeking additional payments from the patient.   The Aetna member ordinarily has no financial obligation to the participating provider beyond a small, fixed copayment and the participating provider is contractually prohibited from billing the subscriber for any other amounts, except under limited circumstances.

18.     The agreements between Aetna and its participating providers allow Aetna to deliver health care benefits efficiently through its provider network, to anticipate and control the cost of care, to reduce financial risk to both employer funded and fully insured plans, to reduce the financial risk faced by subscribers for health care services, and to promote the quality of care through its credentialing and peer review processes.

19.     Beneficiaries have ready access to participating providers.   Aetna publishes directories of participating providers to its subscribers who consume health care services in Texas.   Subscribers may obtain medical services from these providers with little or no financial risk or out-of-pocket expense.

**Out-of-Network Benefits By Non-Participating Providers**

20.     Aetna provides health benefit plans and policies of insurance that typically provide out-of-network benefits for services rendered by non-participating providers, such as the Center, which have not entered into contracts with Aetna and have not agreed to accept negotiated payments as payment in full for services rendered.  When the Center submits a claim for reimbursement for the services performed at the Center, its fees are not set in advance by the terms of a fee agreement with Aetna.

21.     Non-participating providers set their own fees for services rendered to their patients subject to the laws and regulations which govern the practice of medicine in Texas.

22.     Aetna benefit plans and policies of insurance that cover services by non-participating providers may limit the benefits available for out-of-network services and require members to contribute to the cost of care rendered by non-participating providers.

23.     Pursuant to the terms of these benefit plans and policies of insurance, the patient or beneficiary may be responsible for payment of charges for services rendered by non-participating providers which are not covered by their health care plan or exceed the amount of the reimbursement paid by Aetna.  The amount by which a provider's charge exceeds the amount payable under the plan is commonly referred to as the "balance bill."

**HSH's Submission Of False Health Insurance Claims To Aetna**

24.     Patients are encouraged by the terms of their health benefit plans to utilize participating providers, an arrangement beneficial to both the participating

providers, who enjoy increased patient traffic, and the patients who receive appropriate, high-quality health care services at a fair and reasonable cost. Plan provisions that require the patient to pay coinsurance, deductibles and other portions of a hospital's charges for services encourage the patient to be sensitive to health care costs and utilize hospitals with lower fees, which makes medical insurance less expensive.

25.     The Center reassured patients that it would not attempt to collect more from them than the relatively small out-of-pocket coinsurance, deductible or other patient responsibility charges the patient would incur were the Center an in-network facility. In so doing, both Aetna and its members are deceived. Aetna was deceived, because by submitting an inflated and unreasonable claim for payment without disclosing its waiver agreement with the patient, the Center misrepresented the charge the patient actually agreed to pay. The patient was deceived, because the Center's intent to overbill Aetna was not disclosed, and injured, because such egregious billing practices ultimately result in patients paying more for health care services as the cost of health care insurance rises in response to the excessive fees charged by providers who engage in this type of conduct. With respect to employer-funded plans, the plan as a whole suffers due to plan benefits being expended to pay such excessive fees charged to its members.

26.     In conducting its out-of-network and balanced billing schemes, the Center breached its written representations to Aetna, contained in every UB-04 form used to seek payment, "that the beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts." To

the contrary, that is exactly what the Center did as a matter of course. It told patients they would only be responsible up to the amount of their copayment or deductible. Then, in submitting the bill to Aetna, it failed to advise Aetna of that fact, thus seeking payment of the entire inflated charge or balance billing amount.

27.     The Center also submitted unreasonable and excessive fees to Aetna for reimbursement. Under general principles of equity and fairness and under the terms of health benefit plans and policies of insurance that permit an insured to utilize non-participating providers, a non-participating provider's reimbursement is limited to the fair value of its services. The patient's uninformed agreement to pay a non-participating provider's billed charges in excess of the fair value thereof is no bar to the disgorgement of the unreasonable overcharge. Moreover, in various instances, the outrageous charges have been paid to keep members "out of the middle" of a balance billing dispute. Aetna seeks in this action the reimbursement of such money.

28.     The Center submitted health insurance benefit claims to Aetna for the purpose of obtaining payment for services rendered by them to Aetna beneficiaries. In submitting these claims, the Center intended that Aetna rely on the claim forms and representations contained therein in issuing reimbursement for the services billed. Aetna reasonably relied on these representations and issued payment to the Center, unaware that concealed among the electronically submitted claim forms were intentional overcharges, charges for services that should not have been separately billed, and overstated charges resulting from the Center's undisclosed waivers of coinsurance, deductibles or other charges.

### Other Violations Of Texas Statutory Law

29.     The Center has violated numerous Texas statutory laws concerning the billing practices of medical providers providing treatment and services in the State of Texas.  These violations are pertinent to the causes of action asserted by Aetna in this Complaint.

####     i.      *Violations of Texas Occupations Code § 101.203*

30.     Section 101.203 of the Texas Occupations Code mandates that "[a] health care professional may not violate Section 311.0025, Health and Safety Code." Tex. Occ. Code Ann. § 101.203 (West 2012).  Section 311. 0025(a) consists of the following prohibition:

> (a) A hospital, treatment facility, mental health facility, or health care professional may not submit to a patient or a third party payor a bill for a treatment that the hospital, facility, or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary.

Tex. Health & Safety Code Ann. § 311.0025(a) (West 2012).

31.     HSH violated § 101.203 by submitting charges for medical treatment that it knew was improper, unreasonable or medically or clinically unnecessary.

32.     Furthermore, HSH treats patients pursuant to a set pattern of seeking patients based upon their financial viability and reimbursement potential, rather than any determination of patient need.

####     ii.     *Violations of Texas Occupations Code § 102.006*

33.     Section 102.006 of the Texas Occupations Code concerns failure to disclose in regard to affiliations with other health care entities.  A violation of the statute occurs if one accepts remuneration to secure or solicit a patient in a manner

permitted under § 102.001, and does not at the time of the initial contact and at the time of the referral, disclose to the patient (1) the person's affiliation, if any, with the person for whom the patient is secured or solicited, and (2) that the person will receive, directly or indirectly, remuneration for securing or soliciting the patient. Tex. Health & Safety Code Ann. § 102.006(a) (West 2012).

34.     The Center has violated Tex. Occ. Code Ann. § 102.006 by failing to disclose to the patient that their referring physician is affiliated with and has an ownership stake in the Center.

### iii.     *Violations of Texas Occupations Code § 105.002*

35.     Section 105.002 of the Texas Occupations Code concerns unprofessional conduct.  It prohibits a health care provider, in connection with the provider's professional activities, from knowingly presenting (or causing to be presented) a false or fraudulent claim for the payment of a loss under an insurance policy.  It further prohibits a health care provider, in connection with its professional services, from knowingly preparing, making, or subscribing to any writing, with the intent to present or use the writing, or allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy. Tex. Occ. Code Ann. § 105.002(a) (West 2012).

36.     The Center has produced, or caused to be produced, various reports, itemized billing statements, and UB-04 CMS-1450 forms to Aetna seeking payment for its services at fees far higher than the reasonable charges for the same services in the relevant market.  The Center knew these requests for reimbursement included inflated charges for treatment and services that were not reasonable and/or necessary.

HSH knew that these billing forms would be presented to Aetna in regard to claims for benefits under Aetna-insured and employer-funded health care plans.

### iv.    *Violations of Texas Insurance Code § 552.003*

37.    Section 552.003 of the Texas Insurance Code addresses the wrongful charging of different prices by a medical provider for providing the same product or service to patients with differing medical coverage.  A medical provider, such as the Center, commits an offense under Section 552.003 when it intentionally or knowingly charges two different prices for providing the same product or service, where the higher price is based on the fact that an insurer will pay all or part of the price of the product or service.  Tex. Ins. Code Ann. § 552.003 (West 2009).

38.    The Center has violated Tex. Ins. Code Ann. § 552.003 by seeking inflated reimbursements from Aetna for treatment and services rendered to members or insureds that were not reasonable or necessary.  It did so simply because the particular patient had medical coverage through an Aetna policy or an Aetna-administered health care plan that would pay all or part of the charges.  Upon information and belief, the Center does not routinely seek similar charges for similar services for uninsured or underinsured patients.  The Center intended that its inflated billings submitted to Aetna, an insurer, would be paid through health care benefits provided to Aetna beneficiaries and plan members under their fully-insured or employer-funded health care plans.

### Violations Of Ethical Standards

39.    The Center has also violated ethical imperatives for informing patients of a referring physician's conflict of interest when recommending medical care and

viable alternative.  These ethical violations are also pertinent to the causes of action asserted by Aetna in this Complaint.

### i. *Violations of Medical Ethics of the American Medical Association*

40.    The American Medical Association ("AMA") recognizes that business arrangements among physicians in the health care marketplace have the potential to benefit patients by enhancing quality of care and access to health care services. However, these arrangements can also be ethically challenging when they create opportunities for self-referral in which patients' medical interests can be in tension with physicians' financial interests.  Accordingly, the AMA mandates that when physicians enter into arrangements that provide opportunities for self-referral they must "disclose their financial interest in the facility, product, or equipment to patients; inform them of available alternatives for referral; and assure them that their ongoing care is not conditioned on accepting the recommended referral."  AMERICAN MEDICAL ASSOCIATION, CODE OF ETHICS, Opinion 8.032 – Physician's Self-Referral (2011).

41.    The Center has violated the AMA's Code of Ethics through uninformed referrals of its patients to the Center by physicians who are also owners of the facility. Specifically, Aetna members are referred to the Center by physicians who personally profit from their affiliation with the Center through their ownership interest in HSH LLC.  At no time prior to the Center providing out-of-network treatment and services at its facility (and subsequently having the patient incur treatment costs) do the Center or its physician-owners disclose to the patient that the referring physician is affiliated with and has an ownership stake in the Center. Furthermore, neither the Center or its employees advise Aetna members that the money generated from the exorbitant fees

charged by Center to the members and their health insurance plans is ultimately returned as profit to the doctor/owner making the referral to the Center.

ii.     *Violations of Medical Ethics of the Texas Medical Association*

42.     Like the AMA, the Texas Medical Association ("TMA") also recognizes ethical standards necessary to prevent financial abuse of patients by ensuring their informed consent to out-of-network referrals and potential conflicts of interest. Accordingly, the TMA Board of Counselors lists the following current opinions on the Texas Medical Association web site:

> DISCLOSURE OF CONFLICTS TO PATIENTS.
>
> A physician has an ethical obligation to disclose to his patient upon request any compensation arrangement with a health facility, prior to admission or utilization. Upon request, a physician should give the patient a list of alternative facilities, if such are available.
>
> HEALTH FACILITY OWNERSHIP, INCENTIVE PAYMENTS AND CONFLICTS OF INTEREST.
>
> **Disclose ownership to patients**. The physician has an affirmative ethical obligation to disclose his ownership of a health facility to his patient, prior to admission or utilization. Upon request, a physician should give the patient a list of alternative facilities, if such are available, and inform the patient that they have the option to use one of the alternative facilities.
>
> **Comply with applicable law**. Federal and state law prohibits incentive payments designed to induce physicians to admit patients to a hospital or other health care facility. Physicians may not lawfully or ethically accept such payments. Physicians may not ethically accept any payment, directly or indirectly, overtly or covertly, in cash or in kind, from a health care facility for services delivered by the facility.
>
> **Financial Incentives**.  Patients must be informed of any financial incentives that could affect the type and level of care that the patients receive. This responsibility to inform

falls first on the health plan. Physicians should be prepared, however, to discuss with patients any financial arrangements that could affect patient care.[1]

43.    The Center has violated these TMA mandates through uninformed referrals of its patients to the Center by physicians who are also owners of the facility. As previously, Aetna members are referred to the Center by physicians who personally profit from their affiliation with the Center through their ownership interest in HSH LLC. At no time prior to the Center providing out-of-network treatment and services at its facility do the Center or its physician-owners advise Aetna members of the potential financial implications from having services performed at the Center, nor do they ensure that the members are advised of appropriate in-network alternatives.

## IV.
## CLAIMS FOR RELIEF

**A.    First Cause of Action — Common Law Fraud**

44.    Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

45.    HSH LLC is liable to Aetna for common law fraud.  The Center submitted false and misleading claims for the purpose of recovering reimbursement from Aetna for charges that were substantially in excess of the usual, customary and reasonable charges for such services, and thus were manifestly unconscionable and overreaching.  Nothing in the nature and circumstances of the services rendered by the Center justifies the excessive charges submitted to Aetna.

---

[1]    *See* TMA BOARD OF COUNCILORS CURRENT OPINIONS, Texas Medical Association website, located at  *http://www.texmed.org/template.aspx?id=392* (last visited on April 18, 2012).

46.    At the time these misrepresentations were made, the Center knew they were false or made them without regard to their truth or falsity.  Further, these misrepresentations were made with the intention that Aetna act upon them.

47.    In submitting claims for excessive charges, the Center calculated that by reason of the circumstances of their submission and for other reasons, at least some of them would not be discovered by Aetna, thereby resulting in a windfall to HSH LLC.

48.    In submitting claims for excessive charges, the Center did not disclose waivers, reassurances or other promises made to induce patients to use the Center, including reassurances that they would not pay more in coinsurance, deductibles or other patient-responsibility charges than they would at an in-network facility.  The Center misrepresented its facility charges, because the claim it submitted to Aetna was not a claim for the amount that the patient actually agreed to pay, but for an inflated amount.

49.    In reasonable reliance on the false claims and misleading claims submitted by the Center, Aetna was induced to act upon these misrepresentations and paid claims that it otherwise never would have paid.  The misrepresentations, and Aetna's reliance on them, were the direct and proximate cause of damages to Aetna.  HSH LLC benefited from the fraud and either made representations to Aetna as alleged, or sat silently by and reaped the benefits of the fraud.

50.    Aetna seeks to recover its actual damages, consequential damages, incidental damages and costs incurred from the foregoing actions.

**B.    Second Cause of Action — Money Had and Received**

51.    Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

52.     In addition, or in the alternative, Aetna has paid claims to the Center that it would not have paid but for the wrongful conduct of the Center.  Aetna paid these claims based upon the Center's misrepresentations and/or failure to disclose the actual nature of the arrangement with its patients.  The excessive amounts Aetna paid should be returned to Aetna in equity and good conscience.  Accordingly, Aetna seeks the return of money had and received.

**C.     Third Cause of Action — Unjust Enrichment**

53.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

54.     In addition, or in the alternative, HSH is liable under the principle of unjust enrichment.   The Center submitted inflated and unreasonable claims for payment without disclosing that it had entered into waiver agreements with patients. The Center wrongfully billed for hospital services in an amount greatly in excess of the usual, customary and reasonable billed charges for the same services in Harris County and its environs.  Having submitted claims to Aetna for these excessive and unreasonable charges, the Center has been paid by Aetna due to its out-of-network strategy as described herein.  Allowing HSH LLC to retain the fees paid for services allegedly rendered to members of Aetna's various health care plans — to which the Center was not entitled — would unjustly enrich HSH LLC.

55.     Aetna seeks to recover the actual damages, consequential damages, incidental damages, and costs incurred from these actions.

**D.     Fourth Cause of Action — Tortious Interference With Patient Contracts**

56.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

57.    Patients treated at the Center are members or beneficiaries of health care benefit plans and policies of insurance, including (i) self-funded plans for which Aetna provides various third-party claims administrative services, (ii) plans insured under group policies issued by Aetna which plans are established and maintained by private employers, (iii) plans covering federal employees, (iv) plans covering employees of state governmental entities (v) church plans, and (vi) policies issued to individuals.   The plans or policies of insurance are contracts the terms of which govern the coinsurance, deductibles and other portions of a hospital's charges for services for which the member or beneficiary is responsible.   These and other plan or policy terms encourage members and beneficiaries to make responsible and cost-effective health care decisions.

58.    The Center willfully and intentionally reassured patients that it would not attempt to collect more from them than the out-of-pocket coinsurance, deductible or other patient responsibility charges the patient would incur were the Center an in-network facility.   Then it submitted the "balance billing" to Aetna for payment without disclosing what it had told its patients.   In doing so, the Center breached its written representation to Aetna, on the UB-04 form used to seek reimbursement, "that the beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts."

59.    The Center failed to disclose to patients that the referring provider had a financial interest in the Center.

60.    The Center failed to disclose to patients that the same services were available from in-network facilities for a fraction of the cost.

61.     These and other acts and omissions induced patients to receive treatment at the Center rather than at in-network facilities, thereby proximately causing damages for which Aetna seeks relief.

62.     These and other acts and omissions deceived Aetna and the patients, because inflated and unreasonable claims for payment were submitted for services without disclosing the waiver agreements, thereby proximately causing damages for which Aetna seeks relief.

63.     In addition to actual damages, Aetna seeks the recovery of consequential damages, incidental damages and costs incurred from the foregoing actions.

**E.     Fifth Cause of Action — Injunctive Relief**

64.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

65.     The Center is engaging in practices that violate Texas statutory laws and other applicable standards of conduct concerning the billing practices of medical providers and the disclosure of material information to patients.

66.     Aetna seeks injunctive relief that the Center cease and desist these unlawful practices.  Aetna further seeks injunctive relief mandating that the Center notify Aetna members of all economic interests and potential financial gains the Center and physicians that refer Aetna members to the Center will obtain from the patient's out-of-network referral to the Center prior to such referral, as well as ensuring that Aetna members are advised of appropriate in-network alternatives prior to their referral to the Center for treatment.

**F.      Sixth Cause of Action — Declaratory Judgment (State Law)**

67.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

68.     An actual, justifiable controversy exists between Aetna and HSH concerning the improper billing practices of HSH LLC described herein, including its violation of Texas statutory laws regarding same.  Pursuant to 28 U.S.C. § 2201 and Chapter 37 of the Texas Civil Practice and Remedies Code, Aetna seeks a declaratory judgment that (1) HSH LLC has violated Texas statutory laws concerning the billing of medical treatment and services provided to Aetna members, (2) HSH did not disclose waivers, reassurances or other promises made to induce patients to use the Center, including reassurances that they would not pay more in coinsurance, deductibles or other patient-responsibility charges than they would at an in-network facility, and that (3) Aetna is entitled to recoup all overpayments paid to HSH LLC on the excessive charges made on medical claims submitted for the treatment of Aetna's members.

## V.
## EXEMPLARY DAMAGES

69.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

70.     The Center's conduct was fraudulent, malicious and resulted in harm to Aetna.  As a consequence, Aetna is entitled to recover exemplary damages.

## VI.
## EQUITABLE RELIEF (ERISA)

71.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

72.     In the alternative, to the extent this dispute involves the exercise of Aetna's discretion under an ERISA plan, under the terms of ERISA, Aetna is an ERISA fiduciary.  Aetna contends its state law claims may be pursued because they do not relate to ERISA and are not preempted and because some of the plans in question are non-ERISA plans.

73.     To the extent that the Center's entitlement to be paid arises pursuant to Aetna's plan members' assignments to them, the Center stands in the shoes of an ERISA beneficiary.

74.     The Center is in actual or constructive possession and control over specifically identifiable funds that belong in good conscience to Aetna or the ERISA plans at issue in this suit.

75.     As authorized by 29 U.S.C. § 1132(a)(3), Aetna therefore seeks against HSH all relief that was typically available in equity.

76.     Without limitation, Aetna seeks (a) a constructive trust over the fees that the Center improperly demanded and received, (b) an order permanently enjoining the Center or HSH LLC from disposing of or transferring any of the funds still in their possession and control, (c) an order requiring the return of such funds and a tracing of any portion of the funds no longer in the Center's or HSH LLC's possession or control, and (d) a constructive trust over any such funds in the possession or control of the Center or HSH LLC as a result of the fraudulent conduct specified herein.

## VII.
## ATTORNEYS' FEES

77.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

78.     Aetna seeks to recover its reasonable and necessary attorneys' fees and costs incurred in connection with prosecuting this action under, without limitation, Chapter 37 of the Texas Civil Practice and Remedies Code, and in the alternative, 29 U.S.C. § 1132(g)(1).

## VIII.
## CONDITIONS PRECEDENT

79.     Aetna has performed all conditions precedent, or they have otherwise been waived.

## IX.
## JURY DEMAND

80.     Aetna demands a trial of this action by jury on all issues.

## X.
## PRAYER

Plaintiff Aetna Life Insurance Company respectfully requests that Defendant Humble Surgical Hospital, LLC, be cited to appear and answer, and that on final trial hereof, Aetna have judgment against HSH LLC for the following:

*i.*      An award of both actual damages and consequential damages;

*ii.*     An award of exemplary damages;

*iii.*    Equitable relief as requested above;

*iv.*     Declaratory and injunctive relief as requested above;

*v.*      Reasonable and necessary attorneys' fees;

*vi.*     Costs of court;

*vii.*    Prejudgment and post-judgment interest; and

*viii.*   Such other and further relief at law or in equity to which Aetna may be justly entitled.

Respectfully submitted,


OF COUNSEL:                                  By: /s/ John B. Shely
ANDREWS KURTH LLP                                JOHN B. SHELY
    and                                          State Bar No.  18215300
J. SCOTT CAROTHERS                               Southern District No. 7544
State Bar No. 03834100                           *johnshely@andrewskurth.com*
Southern District No. 2067                       600 Travis, Suite 4200
*scottcarothers@andrewskurth.com*                Houston, Texas 77002
    and                                          Telephone:  (713) 220-4200
MITCHELL A. REID                                 Telecopier:  (713) 220-4285
State Bar No. 24037346
Southern District No. 34728                  ATTORNEY-IN-CHARGE FOR PLAINTIFF
*mitchreid@andrewskurth.com*                 AETNA LIFE INSURANCE COMPANY