```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3
    AETNA LIFE INSURANCE        .  Civil Action
 4  COMPANY                     .  No. 12-1206
                                .
 5                              .
    VS.                         .
 6                              .
                                .
 7                              .
                                .
 8                              .
                                .  January 3, 2014
 9  HUMBLE SURGICAL            .  10:17 A.M.
    HOSPITAL, LLC              .  HOUSTON, TEXAS
10
                   TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE LYNN N. HUGHES
                UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES:

14  FOR PLAINTIFF:
                          MR. JOHN BRUCE SHELY
15                        MS. DENA HANOVICE PALERMO
                          MR. BRIAN C. PIDCOCK
16                        Andrews Kurth
                          600 Travis Street
17                        Suite 4200
                          Houston, Texas 77002
18

19  FOR DEFENDANT:        MR. BRIAN D. MELTON
                          MR. JONATHAN ROSS
20                        MS. MELISSA LEANNE DOWNEY
                          Susman Godfrey LLP
21                        1000 Louisiana
                          Suite 5100
22                        Houston, Texas 77002

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
```

```
 1   APPEARANCES (Continued):

 2

 3
     ALSO PRESENT:              MS. KAREN CHOTINER
 4

 5

 6
     OFFICIAL COURT REPORTER: MS. STEPHANIE CARLISLE WHITE
 7                            U.S. District Court
                              515 Rusk, Suite 8016
 8                            Houston, Texas 77002
                              713.250.5157
 9

10

11

12

13

14                                 *  *  *
15

16

17

18

19

20

21

22

23

24

25                          P R O C E E D I N G S
```

```
 1                    (January 3, 2014)
 2          THE COURT:  Mr. Melton, you do not need to rise.
 3               You may if you want to.  It is not obligatory
 4  in the least.  Are you mending?
 5          MR. MELTON:  Yes, I'm out of a wheelchair.
 6          THE COURT:  Makes you grateful, doesn't it?
 7               I have just signed an order, which the clerk is
 8  copying, that requests Humble to disclose its Houston lawyers'
 9  contacts with the Connecticut firm and the New Jersey firm
10  over the last five years.
11               Any question about that?
12          MR. MELTON:  I don't have any questions yet, Your
13  Honor.
14          THE COURT:  It may not have been entered yet.  I
15  just did it 20 minutes ago.
16               Mr. Melton, tell me about this transcript
17  problem.
18               Have you seen, Mr. Shely, the proposed
19  confidentialities?
20          MR. SHELY:  With respect to, Your Honor?
21          THE COURT:  The transcript of the October 24th
22  hearing.
23          MR. SHELY:  I'm familiar with it, Your Honor.  And I
24  don't know if there's any issue relating to it or not.
25          THE COURT:  I'm a little confused.  The proposed
```

1  secrets -- the order of confidentiality has been substantially

2  modified, but I am perplexed that how on page 56, line 11 is

3  confidential where the Court says:  "Interesting that the

4  increases in hospital charges are treated as inflation."

5              Can you give me some hint about the privacy

6  concerns connected with that observation?

7              MR. MELTON:  Your Honor, I'm not looking at the

8  transcript.  The discussion was how Humble Surgical Hospital

9  raises its rates.  We view that as confidential so that our

10  competitors don't get access to our internal business

11  practices.

12              THE COURT:  Even to the extent that Humble has

13  internal business practices that are confidential or

14  proprietary, that cannot be in a conceivable world that you

15  adjust prices according to inflation or you call increases in

16  expenses inflation, or inflation increases in expenses.

17  However you slice it, that's not a business practice, it is

18  not a plan, it is not specific products or services that are

19  being marketed and the price charged -- or the price, usually

20  it is the cost that is the problem, sometimes prices are.

21              On page 59 a discussion starting on --

22  discussion continued -- but the redacted part starting on line

23  7 reflects that the Ingenix index, I will call it, was

24  multiplied by a price of three.  That is just a fact.  That is

25  not confidential.

1          MR. MELTON:  Your Honor, it is the same.  The way

2  Humble Surgical Hospital set in this case the charge master we

3  view that as trade secret and confidential.  We don't want our

4  competitors knowing how we set our prices.  And they are not

5  entitled to that information.

6          THE COURT:  Page 62, line 12, Dr. Kabichi

7  [phonetics], says, "Your Honor, that's why we use the HPS

8  system which is used across by other major hospitals."  If it

9  is used by a whole bunch of people how can that be

10  confidential, much less proprietary?

11          MR. MELTON:  Your Honor, the same response.  What we

12  do is not -- everybody else is not entitled to understanding

13  our internal business practices for competitive reasons.  If

14  it was mandated that we use that method I could see the

15  argument.  But we make choices on how we do it.  It doesn't

16  matter whether others make the same choice.

17          THE COURT:  And the whole bizarre series of

18  questions and answers on page 63 where they used Ingenix and

19  multiplied something by three, but they didn't use the

20  hospital Ingenix because they had gone out of business.  How

21  did you get the first part if you have two different forms of

22  Ingenix indices?  You used one and you didn't use the other

23  one, because they were out of business.  You have marked that

24  as confidential and privileged.  It is inconsistent, evasive

25  and probably some other things.  Confidential, proprietary,

1  secret, privacy related, it is not.  This whole thing is about

2  buying commercially available indices.  On page 67 you want to

3  keep secret the Court's statement.  It talks about various

4  data bases and other vaguenesses.

5          MR. MELTON:  Your Honor, this whole discussion was

6  about how we set our internal pricing.

7          THE COURT:  That's how you do it in any precise way,

8  it is the Court's observation about how you described how you

9  came up with it.

10          MR. MELTON:  Yes, sir.

11          THE COURT:  You can't use that sentence of mine to

12  go price hospital services, or I guess you could; just give

13  some vaguenesses and some databases and bingo, you have a

14  charge master.

15          MR. MELTON:  Your Honor, we went through it

16  specifically looking for characterizations or statements about

17  our internal business processes.  We didn't blanket try to say

18  the whole transcript was -- we went through it for specific

19  reasons.  That was to protect our internal pricing, trade

20  secrets from the market.

21          THE COURT:  Did you follow the processes in the

22  confidential order?

23          MR. MELTON:  We believe we did, Your Honor, yes.

24          THE COURT:  Did Aetna agree to those decisions?

25          MR. MELTON:  I don't believe we have heard back from

1  them.

2          MS. DOWNEY:  Your Honor, I called the Court

3  coordinator to try to make sure we were following the

4  procedure correctly, because there was, I believe, a Southern

5  District ruling on how to designate hearing transcripts

6  confidential.

7          THE COURT:  I entered an order.

8          MS. DOWNEY:  You're right, Your Honor.  Based off

9  the order it said within 30 days of receiving the transcript

10  we needed to designate it confidential.  So I called the Court

11  coordinator and she suggested that I let the court reporter

12  know, and that once it was designated confidential and entered

13  into the record, redacted, if the other side had any issue

14  with what was redacted we could both brief the issue and bring

15  it before the Court.

16          THE COURT:  Mr. Shely, were you asked to consent to

17  these?

18          MR. SHELY:  No, Judge.  And again, we haven't

19  focused on that at all.

20          THE COURT:  Probably took time off or something.

21          MR. SHELY:  Well, no, just keeping track of the new

22  lawsuits they have been filing, Judge.  It has been a full

23  time job the last couple of weeks.

24          THE COURT:  I think we will make everybody go to

25  Connecticut for the rest of the week.  The survivors can come

1 back and we probably can resolve this.

2          MR. SHELY:  I understand the weather is beautiful

3 today, Judge.

4          THE COURT:  I only went through the first hundred

5 pages of the transcript.  And I assume the rest of it is

6 consistent.  That seems like a fair sample.

7                Ms. Downey, the redactions covered by that rule

8 are Social Security numbers, minor's names, things like that.

9 They are not court comments.  Of course, it's...

10               Treating Joanna Stanley's [phonetics] e-mail of

11 December 26th as a motion by Humble to seal those parts of the

12 transcript of October 24th, it is denied.

13               All right.  Mr. Shely, are you prepared about

14 something?

15          MR. SHELY:  I am, Judge.

16          THE COURT:  Okay.

17          MR. SHELY:  The Court, of course, has set show cause

18 order as to why Humble's answers should not be struck because

19 it has filed related litigation and has threatened Aetna with

20 suit and filed suit involving the precise, exact conduct that

21 this Court ruled upon and said Aetna could do, and it is time,

22 Judge, Aetna's view, to put an end to this.

23               Two years ago, nearly two years ago, Aetna

24 filed suit claiming that physician owners of Humble were

25 referring patients and charging outlandish amounts to get

1  extra money.  Despite multiple orders of this Court for Humble

2  to disclose all relevant documentation, everything, to use the

3  Court's phrase, about Aetna's claim under its money had and

4  received theory for overpayment, Humble didn't do it.  Humble

5  went through a number of lawyers, different sets of lawyers,

6  Humble said it had complied.  It has never been the case.

7            Now, fast-forward after spending all this money

8  and all this Court time on what the Court set as it has every

9  right to do in its discretion for case management that first

10  we would do the accounting, first we would determine how much

11  has been overpaid by Aetna.  Putting aside for another day

12  Aetna's other counts, such as fraud, putting aside other

13  defenses or motions or claims that Humble would like to

14  assert, now this Court set the logical step of we are going to

15  do the accounting first.  The reason --

16            THE COURT:  It seemed logical at the time.

17            MR. SHELY:  I think it was, Judge.  In the end the

18  reason it has taken this long, nearly two years to get to this

19  point is because of Humble's recalcitrance.  That

20  recalcitrance has now morphed to defiance.

21            Let's figure out what has happened here.

22  Humble runs in with an alleged emergency motion saying that

23  Aetna is sending out letters to doctors and posting

24  information on a site available to members for the purpose of

25  explaining its position as to Humble.  They run in and they

1  say you can't do that.  Judge Hughes, please stop them.  Here
2  are the actual letters they've sent.  Here's the note, you've
3  read them on the bench.  The Court heard the arguments, had a
4  hearing over two days and held expressly and followed up with
5  a written order that Aetna was entitled to do precisely what
6  it had done; send the letters, post the website, because it is
7  in connection with its plan and claim administration.
8             You entered an order on the 26th of November
9  that said exactly that.  We went to mediation requested by
10 Humble the next week.  It was unsuccessful.  Aetna filed a
11 notice saying it has been unsuccessful and we would like when
12 the Court has the time for it to rule on our motion for
13 judgment.  In that motion for judgment we have proven that
14 Humble expected only a third of what it was billing Aetna.  As
15 the Court indicated early on in the case Humble had a duty to
16 do honest billing.  It did not.
17            There's an admission of Humble, several
18 admissions, in fact, in the record and on the record that they
19 only expected a third.  That is a basis for Aetna's motion for
20 judgment and a supplemental motion for judgment in which it is
21 specifically at Docket No. 129 a reply brief in support of
22 both where Aetna seeks $20,802,424.35 as it has proven up.
23            Now, in addition to the merits of the motion
24 for judgment as this Court has stated and given Humble many
25 last chances it must comply with the Court orders regarding

1    discovery and any other matters set by this Court.  It has not

2    done so.  Most recently, after losing the motion that it

3    brought for this Court the week of Thanksgiving and after the

4    mediation failed and after this Court issued an order saying,

5    Aetna I have got your notice and I am going to rule on the

6    motion for judgment, they go up without notice to this Court

7    or to Aetna through counsel and filed suit in Connecticut

8    raising the exact same issues -- it tracks word for word,

9    Judge.  I have got an exhibit here.  I'm sure the Court has

10   read it, I did, where you can see that Aetna's notice of

11   violation of the order, Docket No. 166 filed in this Court and

12   was heard several days later uses the precise language that

13   they use in their Connecticut lawsuit at Paragraph 17 and 18.

14                    There are other examples.  So to see the

15   response filed late last night of Humble that really there

16   isn't any duplication here and there isn't any related

17   litigation is hogwash.  In fact, the response filed by Humble

18   to this Court's show cause order really serves not as a

19   defense of its conduct, but as an indictment.  Because it is

20   clear that they are going to run anywhere, Judge, and anyplace

21   that has opportunity, and file lawsuits against Aetna about

22   the conduct that is properly before this Court.  This Court

23   has spent nearly two years on this case.  Because they don't

24   like your rulings, Judge.  It is simple as that.  They don't

25   like the way you are managing the case, Judge.

1                 Well, the last time I looked, Rule 1 of the
2   rules in this Court's discretion allows this Court case
3   management ability.  And so, they simply don't like that the
4   accounting is being decided first.  So what do they say in
5   response to filing a second -- we were supposed to have this
6   hearing last Friday, Judge.  They said, we don't want to be
7   there on the 27th.  The Court gave them a week, fair enough.
8                 THE COURT:  I didn't want to be here either.
9                 MR. SHELY:  I understand, Judge, that made it three
10  for three.
11                THE COURT:  But I was here.  That's the only
12  difference.
13                MR. SHELY:  Instead on the 27th, last Friday, they
14  filed a suit in New Jersey.
15                THE COURT:  That's just a coincidence.
16                MR. SHELY:  I'm sure it is a coincidence, Judge.  So
17  in that suit they are asserting a bunch of ERISA claims.
18                Now, they have filed in this case a motion for
19  leave to file a counterclaim.  And as I read their response
20  that they filed last night they don't think -- they have no
21  reason to believe that you are going to grant that motion.  I
22  don't know how they could know that because you haven't ruled
23  on it yet.  What they really don't like, Judge, is that you
24  are deciding --
25                THE COURT:  Anybody ever tells you they know what I

1    am thinking you know they are wrong.  I don't know until I do

2    it.

3              MR. SHELY:  I understand, Judge.  And they have said

4    that you refused to actually address their motion for leave.

5    Again, they don't like the way you are running this case,

6    Judge.  And they are bound and determined to try to do

7    something about it.  So they have now filed in the last ten

8    days or so two lawsuits, one in Connecticut claiming -- making

9    the same state law claims.  Well, we removed it.  They pled a

10   beautiful completely preempted claim.  It is removed, it is in

11   federal court.  We are going to file a motion to transfer it

12   down to this Court.

13             THE COURT:  Thanks.

14             MR. SHELY:  Yes, Judge.  I think -- can't predict

15   what a court is going to do, but I have a feeling it will be

16   sent this way.  And then I guess they had a week go by, so

17   here's another one.  We can go file in New Jersey too.  And

18   they have got this dichotomy in their head, you can tell from

19   their papers, that, well, we get to do state law claims and

20   federal ERISA claims over here.  I don't think they went back

21   and looked at their motion for leave to file a common claim or

22   a proposed complaint.  They say they know what you are going

23   to do about that.

24             But there they asserted ERISA claims and state

25   law claims; breach of contract, insurance code and some

1  others.  So if they want to bring claims against Aetna, fine,

2  it will -- it should be in this Court.  It should be when this

3  Court determines that the next step of the case is going to

4  take place.  We opposed on two grounds their motion for leave

5  to file their counterclaim.  One was it was late.  They filed

6  it facing the motion for judgment.  They suddenly found a

7  counterclaim, not a novel stretch to... dispositive motion.

8           THE COURT:  16 months into the case.

9           MR. SHELY:  Yes, Judge.  They said they had just

10 discovered they had the claim based upon something we had just

11 said.  That's hogwash.  We also said that the Court should not

12 decide it until it has ruled on the motion for judgment.

13 That's what -- I guess that's what the Court has decided to

14 do.  It is going to have the accounting issue handled first.

15           So there's about one thing that I can see in

16 their response that they filed last night to your show cause

17 orders that Aetna and Humble agree on.  That's that you can

18 enjoin them.  You can enjoin them from proceeding in any other

19 court as to any claim against Aetna except for right here in

20 front of you.  And we are requesting that you do so because we

21 got two down, but we don't want 48 others that we have to go

22 figure out.  I think they have shown what they are about.

23 What is really going on here, Judge, is Humble and its

24 principals don't think you will act.  They have been told

25 before that it was their last chance and nothing really

1  happened to them.  They have been told that the motion for

2  judgment is going to be ruled upon, but it hasn't been yet.

3  And so their view is we will just try to hold things steady

4  down there in Houston, and we are going to go see if we can go

5  get a different judge who will rule for us in a manner

6  different from the way Judge Hughes is running the case.

7  That's what they are doing.

8              If they want to get up here and tell you these

9  cases aren't related, I ask you to compare the language that

10  they used.  They have already asserted an ERISA claim in this

11  Court.  There's nothing wrong with deciding the accounting

12  issue first.  They don't seem to like that approach, Judge.

13              But I want to -- I want to end with where I

14  started.  Almost two years ago we filed this suit.  We didn't

15  get the kickback documents from Humble directly despite orders

16  from this Court to produce everything.  No-no, no-no.  We

17  discovered -- I believe it was in May or June that one of

18  those documents was attached -- or found out it was attached

19  or found out later because of a proceeding that a doctor who

20  is in a dispute with Humble brought.

21              And even then wrote a letter immediately to

22  Humble's counsel, and I said I want those documents.  They

23  said no.  You ordered them produced.  You said produce

24  everything.  They didn't do it.  It wasn't until we had our

25  show cause hearing and the next day a deposition of the person

1  where they finally were in the corner and you told them to

2  produce it.

3          THE COURT:  Again.

4          MR. SHELY:  Again, Judge.  So by name, by almost

5  serial number.  Now, Humble has gotten away with that to date.

6  They shouldn't get away with it anymore.  Not only is it

7  inefficient, not only is it costing money, it is not the way

8  the rules and the system works.  They don't think you are

9  going to rule.  They don't think you are going to do anything

10  to them so they are going to keep up this conduct.

11          So what we are asking you to do, Judge, is rule

12  on Aetna's motion for judgement on the merits.  We are asking

13  that you strike Humble's answer.  We are asking that you also

14  grant Aetna's motion for judgment based upon the sanctionable

15  conduct, the continued conduct of Humble in this case.  And we

16  are asking that you enjoin Humble from proceeding in any claim

17  against Aetna, in any form other than before you, so that we

18  can at least know which court we are in and not have them go

19  around the country sprinkling lawsuits during the holiday

20  season.  Thank you, Judge.

21          THE COURT:  When they are too busy to be here.

22          MR. SHELY:  We did note that, Judge.  But Humble

23  was -- had enough hands to file an extra lawsuit.

24          THE COURT:  Mr. Ross, come sit here and hold his

25  crutch, please.  So you don't have to bend and twist.  I don't

1  know what you did to your leg but it can't be good for you to

2  be doing the hokey pokey trying to manage your crutch.

3            MR. MELTON:  May I proceed?

4            THE COURT:  Yes, sir.

5            MR. MELTON:  Your Honor, we are here today to show

6  cause why our answers should not be struck for filing.

7            THE COURT:  Let me interrupt.  Humble offered an

8  exhibit that was a PowerPoint slide show sort of thing about

9  Humble Surgical and the building and its role in the

10 community.  Do you remember that?  Your first hearing?

11           MR. MELTON:  Yes, Your Honor.

12           THE COURT:  Was that made part of the record?

13           MR. MELTON:  I don't believe it was.  You handed it

14 back to me.

15           MR. SHELY:  I believe it was not made part of the

16 record, Judge, because that was a hearing in chambers and I

17 believe he gave --

18           THE COURT:  It was on screen right there.

19           MR. SHELY:  Maybe there was a subsequent hearing --

20           MR. MELTON:  The first hearing was in chambers.

21           THE COURT:  Was -- I thought we had one where there

22 were pictures of the building.

23           MR. SHELY:  There have been pictures of the

24 building, Judge, but I believe both before Mr. Melton's

25 appearance and at the first hearing for Mr. Melton he had a

1  PowerPoint that you looked at and gave back to him.  I don't

2  believe it was made part of a record.

3              THE COURT:  My recollection is I interrupted him

4  halfway through it.

5              MR. SHELY:  Well, Judge, that may have happened.  I

6  still remember it the way I have stated.

7              THE COURT:  I could have mixed him up with another

8  27,346 people I have interrupted.

9                  Do you think you know what I am talking about?

10  It was about the cost of the building and pictures of the

11  building.

12              MR. MELTON:  I believe it was at the first hearing.

13  I handed it to you, and you handed it back.  It was not made

14  part of the record.

15              THE COURT:  I would like to make that part of the

16  record.  Please file it.

17              MR. MELTON:  Yes, Your Honor.

18              THE COURT:  I am assuming you don't have a handy

19  hard copy?

20              MR. MELTON:  We do not.

21                  So, there are two reasons the answer shouldn't

22  be struck for doing what the Court expressly allowed.  First,

23  we don't believe the Court even addressed the libel, slander,

24  defamation issue.  Two, striking of our answers is not an

25  appropriate remedy for what we did.

```
1              THE COURT:  What is the appropriate remedy?
2              MR. MELTON:  They are saying --
3              THE COURT:  What is the appropriate remedy?
4              MR. MELTON:  Injunction if it is available would be
5    an appropriate remedy.  I will address that.
6                   First, we didn't violate the Court's order.
7              THE COURT:  Which order?
8              MR. MELTON:  The order dated November 26th, 2013.
9    Order on relief.  "Aetna Life Insurance Company may use
10   information about the practices and providers that it has
11   learned regardless of its source as long as its use is
12   directly related to its participants, plans, providers,
13   practices, physicians and other aspects of claim
14   administration."
15                  That was the order.
16                  We don't complain about the source of the
17   information they use in the Connecticut action.  We don't
18   complain.  In fact, we don't even know what the source of the
19   information is.
20             THE COURT:  I have read the complaint in
21   Connecticut.
22             MR. MELTON:  Right.  We are complaining about what
23   they say, not the source of the information.  We were in front
24   of the Court on our notice of violation of confidentiality
25   order.  That was what we have filed.
```

1            THE COURT:  I know what you were here for.

2            MR. MELTON:  Document No. 166.  At the time, we

3  believed they had used documents produced in this

4  litigation --

5            THE COURT:  I don't want to rehear that.  As fond as

6  you are rehearing everything -- do you have the Connecticut

7  complaint?

8            MR. SHELY:  Judge, it is attached as Exhibit 4 --

9            THE COURT:  Here it is.

10           MR. SHELY:  -- to Document 182.

11           THE COURT:  Page 3, Paragraph 17 says something

12  about the source of the information in the Connecticut action.

13           MR. MELTON:  Your Honor, that's not our complaint.

14  Our complaint --

15           THE COURT:  Why is it in there?

16           MR. MELTON:  Which page, Your Honor?

17           THE COURT:  Paragraph 17, page 3.  Do they really

18  still use esquire in Connecticut?

19           MR. MELTON:  Yes, Your Honor.

20           THE COURT:  They still have separate courts of laws

21  of equity, don't they?

22               Texas was the first American jurisdiction to

23  merge law and equity.  My guess is that you had a bunch of

24  young revolutionaries sitting around and they said we never

25  understood that stuff anyway.  Let's kill it.

1             MR. MELTON:  Your Honor, that one sentence is

2 background.  It has nothing to do with causative action.

3             THE COURT:  Why is it in there?

4             MR. MELTON:  Background, Your Honor.

5             THE COURT:  It is not background.  It is an attempt

6 to throw an extraneous fact, which is false, to color it.  It

7 is not background.  It is a thinly veiled insult.

8             MR. MELTON:  Your Honor, we don't believe it is

9 false.

10            THE COURT:  What are the elements of defamation in

11 Connecticut?

12      (Pause in the proceedings)

13            THE COURT:  Mr. Sklaver writes beautifully short

14 paragraphs.

15            MR. MELTON:  Yes, Your Honor.

16            THE COURT:  He has probably read the rules

17 somewhere.

18            MR. SHELY:  He also incorporated every one of his

19 statements into a second cause of action, Judge.

20            THE COURT:  As near as I can tell, the falsely

21 defamatory things, a lot of this... defamatory but absolutely

22 true is that they have told people with whom they are dealing

23 that are having to treat Humble claims differently because of

24 the arrangement Humble had with physicians.

25            MR. MELTON:  Yes, Your Honor.  They falsely alleged

1  that we entered into illegal and improper and unethical

2  agreements --

3           THE COURT:  You don't have to repeat yourself three

4  times, Mr. Melton.  They said the contracts with the

5  physicians and the billing practices at Humble were wrong.

6  You say they are right.  That's a dispute.  And it is being

7  communicated in direct connection with the joint business of

8  Humble, Aetna, and most of all, the overlooked participants.

9           MR. MELTON:  As well as others.

10          THE COURT:  That's probably privileged.  Not in the

11  sense you like to use it, but in the sense that a legitimate

12  dispute and comment even if they turn out to be wrong is about

13  the business of the parties can't be defamation.

14          MR. MELTON:  We disagree.  Getting out there in

15  letters --

16          THE COURT:  Mr. Melton, I have told you a number of

17  times I don't care whether you agree with me.  Do not keep

18  saying that after I say something.  I know how they are

19  communicating.  What is the subject of the letter to the

20  participant?

21          MR. MELTON:  The subject of the letter to the

22  participant?  They're telling them on the phone and in

23  letters --

24          THE COURT:  I asked you the content of the letter is

25  about what, and don't tell me about phone calls or websites.

1  Answer my question, please.

2         MR. MELTON:  They tell them we are falsely violating

3  Texas law.

4         THE COURT:  The subject of the letter is the

5  participant's insurance policy, isn't it?

6         MR. MELTON:  Subject of the letter is Humble

7  Surgical Hospital and its business.

8         THE COURT:  The reason Aetna sends the letter to Jim

9  Bob in Tulsa is because it has a financial relationship to

10  whom it actually bears a fiduciary duty to tell them about how

11  it is going to handle claims, and a brief explanation of why.

12  That is a communication about a joint, legitimate, business

13  concern.  In Texas law it is privileged, and cannot be the

14  subject of slander.

15            And I suspect since we borrowed that from

16  England so did Connecticut just a hundred years earlier.

17  These communications are business communications to existing

18  people.  And no matter what the reason it -- people may cancel

19  their surgery if they find out one of two things; the carrier

20  is not going to pay for it, or there's some question about the

21  propriety of the billing question.  It doesn't have to be

22  proved.  Consumers don't have to go to a grand jury to find

23  out what to do.  But there's some question about how the

24  billing is going on, they may do that.  And that's directly

25  related to their legitimate interest.

1              So, there is a legitimate question about

2  Humble's billing practices.  If there hadn't been, there

3  wouldn't have been three sets of lawyers delaying every

4  discovery request and claiming they weren't with us, they were

5  with a wholly owned subsidiary of the majority shareholder of

6  Humble and all of the other shallow, devious, evasions,

7  obstructions, all coupled with a vehemence of advocacy that

8  pass the rational.  Humble thinks there's a legitimate claim

9  because it doesn't want to talk to me about what it is really

10  doing.  So there is a legitimate claim.  It is not defamation,

11  filing a defamation suit 1600 miles away, something like that.

12  The week you couldn't possibly be here for the hearing, but

13  you could prepare other actions in other states.

14              MR. MELTON:  Your Honor, could I address that?

15              THE COURT:  Sure.

16              MR. MELTON:  Mr. Ross was in California.  I was in

17  Louisiana at the time the order came out to be here on that

18  Friday.  We did not delay, as he says, because we just wanted

19  to file -- to be honest with you, we thought it was filed the

20  day before Christmas.  We didn't find out until later it was

21  going to be filed Friday.  We thought it was going to be filed

22  on the Tuesday before Christmas, this class action that he

23  says we surreptitiously delayed this hearing to file it on the

24  day we were going to be in this hearing.  It is wrong.  He

25  should have never said it.

1          THE COURT:  Mr. Melton, you are wandering off the

2   track again.

3          MR. MELTON:  I hear you.  But I don't want it to be

4   alleged that my attorneys and I were somehow delaying this

5   hearing for any reason other than we were out of the state.

6          THE COURT:  Let me rephrase that.  Did you go see

7   your mother?

8          MR. ROSS:  I did.

9          THE COURT:  She is a lot nicer than he is.

10         MR. ROSS:  She reminds me of that all the time.

11     (Discussion off the record)

12         THE COURT:  Mr. Melton, let me rephrase the

13   position.  Humble was supposed to be here on the 27th.  Humble

14   couldn't be here on the 27th.  Humble could file other

15   lawsuits, other places using apparently a common word

16   processing database.  While Mr. Ross is always welcome, he's

17   not counsel of record -- stuck with him now because he's shown

18   up, but Ms. Downey and you and the other woman have been

19   showing up and -- as I recall, two sets of Jackson Walker

20   lawyers.

21         MR. SHELY:  Yes, Judge, there was a set before the

22   Fifth Circuit and then after the Fifth Circuit opinion.

23         THE COURT:  So Humble has had lots of representation

24   and it has gotten lots of orders from the Court about

25   producing stuff related to this dispute, and yet it was May,

1  June before a cooperation agreement was discovered elsewhere,

2  but by Aetna.  And then it still required a court ordered

3  supervised deposition of the principal of Humble to get the

4  rest of them.

5          MR. MELTON:  That's not accurate, Your Honor.

6          THE COURT:  It is accurate.

7          MR. MELTON:  That is not accurate.  We briefed it --

8  if the Court would have ordered it -- the Court knew about it

9  before that deposition.  We had briefed the entire issue

10  before the deposition.  It was pending before the Court.  The

11  Court --

12          THE COURT:  When did you produce them?

13          MR. MELTON:  After the Court ruled we should produce

14  them.

15          THE COURT:  When?  How soon?  You have produced

16  stuff after I ordered, but sometimes it is a year.  When?

17  First of all, Mr. Melton, I have gone through this with you,

18  but you may not remember.  This is not a game where you do as

19  little as humanly possible where you think you can plausibly

20  argue that it meets the letter of the law.  We have had

21  numerous conversations -- we, that is Humble and I -- but a

22  lot with you too -- give them the records about their billing

23  practices and what I will call the referral problem.  And it

24  took from April of 2012 until June of '13.

25          MR. SHELY:  No, Judge.  We discovered in May or June

27

1  one of the documents as a result of another proceeding.  We
2  weren't given these until we had the deposition, which I think
3  was in late October, and then subsequent -- it was probably
4  November was the first time that we were produced the
5  underlying documents.  And it did result from your order at
6  the end of the deposition in your jury room.  And you gave
7  them two or three weeks thereafter and they were produced
8  sometime in that time period.
9           MR. MELTON:  Yes, Your Honor.
10          THE COURT:  Wait a minute.  From the date the case
11  was filed and we immediately began discussing --
12          MR. SHELY:  Yes, Judge, from April of 2012 to
13  November 2013 Aetna did not have underlying documents related
14  to its claim.
15          MR. MELTON:  The referrals were never raised at any
16  hearing prior to our involvement in the case.  The first time
17  the referrals were raised were in correspondence between
18  Mr. Shely --
19          THE COURT:  Counsel --
20          MR. MELTON:  -- and us.
21          THE COURT:  -- the problem, you've just illustrated
22  what I can ultimately -- ultimately complained about.  The
23  other side does not have to say, please allow us to discover
24  the contract between Dr. Ferguson and Humble dated May 12th,
25  2011.  That's not how discovery works, and I guarantee you

1  that's not how discovery requests you send are phrased.  Do

2  you want me the show the last discovery request you sent in a

3  new case?

4          MR. MELTON:  I can, Your Honor.

5          THE COURT:  It has two pages of definitions of what

6  a document is and then all and every each -- all and paper and

7  it just goes on synonym after synonym, doesn't it?

8          MR. MELTON:  I would have to look at the last one I

9  sent, Your Honor.  Some courts don't allow discovery requests.

10 In the Eastern District of Texas they don't allow them.

11         THE COURT:  Well, I don't allow them except after I

12 find out whether they are carefully tailored.  So I saved you

13 from getting this sort of stuff you must file elsewhere.  But

14 there were continual orders for full disclosure of everything

15 related to this.  Despite a varied if not checkered career to

16 be a lawyer, I never ran a clinic or worked in one.  That is

17 little high tech for me.

18             So I can't sit there, Shely can't sit there and

19 come up with exactly which documents they want.  So when I

20 say, give them all the documents related to this billing

21 practice, that would include the arrangements by which Humble

22 is kicking back to the doctors part of the fee.

23         MR. MELTON:  Your Honor, and when it was briefed we

24 disagreed.  We filed briefing with the Court.  We didn't run

25 from you.  We --

1          THE COURT:  You didn't produce it in June of 2012.
2    By "you," I mean Humble.  You can't start over when you join
3    the case, Mr. Melton.
4          MR. MELTON:  Your Honor, respectfully, the orders
5    issued by this Court did not go to that level.  We were trying
6    to comply.  And if you look, remember the Exhibit 11?  They
7    are not up here today.  At that deposition they listed 20
8    things they wanted.  We got it very specifically.  We made it
9    an exhibit to the deposition and I planned -- we have given
10   them everything they want.  These agreements were raised.  We
11   disagreed.  We produced it.  The Court ruled on it.  We gave
12   it to them.  We are not running from discovery.
13         MR. SHELY:  Judge, your very first order told them
14   to give us the materials ahead of our first hearing related to
15   the claims.  All they had to do was look at, among other
16   things, paragraph 8 of our complaint, which talks about
17   physician owners getting money for referring patients, gouging
18   Aetna, and they should have known that.  It is Aetna's view
19   that Humble didn't want us to know about this.  That's why
20   they claim everything was a trade secret and confidential and
21   not a word was said about it until Aetna discovered it.
22   That's the point.
23         THE COURT:  Collateral.
24         MR. SHELY:  Yes, Judge.
25         THE COURT:  I have a meeting at lunch so how are you

1  feeling?

2          MR. MELTON:  Pretty good, Your Honor.

3          THE COURT:  What time is your plane back?

4          MR. MELTON:  I'm here, Your Honor.

5          THE COURT:  I thought you were commuting from Austin

6  or someplace.

7          MR. MELTON:  No, Your Honor.

8          MR. ROSS:  He was in Louisiana.  I was in

9  California.

10          THE COURT:  I just thought -- do you have a Dallas

11  office?

12          MR. ROSS:  We do.  But no, he wasn't there.  He had

13  to get something removed from his foot and stabilize it after

14  the accident.

15          THE COURT:  Well, no, I tried to put one of the

16  orders -- I don't want him doing things that are going to hurt

17  him.  They have got all kinds of lawyers at Susman.  You are

18  blocking a good one.

19          MR. MELTON:  Your Honor, I was ordered to appear by

20  name.  That's why we thought we needed to be here.

21          THE COURT:  I didn't know you couldn't.

22          MR. ROSS:  He can.  We are back.  We are back as of

23  yesterday.

24          THE COURT:  I've been known to order dead lawyers to

25  show up.

1          MR. ROSS:  And they have.

2          MR. MELTON:  Based on past experience, I can go

3 until about 2:00 and then it starts hurting.

4          THE COURT:  Could you go rest and come back at 2:00?

5 Would that be possible?

6          MR. MELTON:  Sure, Your Honor.  The longer -- if it

7 is not elevated above my heart it doesn't matter.  That's what

8 the doctor tells me.  Then it starts throbbing about 2:30 or

9 3:00.

10          THE COURT:  Hang on just a minute.

11      (Discussion off the record)

12          THE COURT:  9:30 Tuesday?

13          MR. SHELY:  That's fine, Judge.

14          MR. MELTON:  I think that's fine, Your Honor.

15             That's fine, Your Honor.

16          THE COURT:  All right.  I'm sorry about that.  But

17 I've got to go.

18      (Concluded.)
                                  * * *
19
   I certify that the foregoing is a correct transcript from the
20 record of proceedings in the above-entitled cause, to the best
   of my ability.
21

22
   //s_____        02/25/2014
23 Mrs. Stephanie Carlisle White, CSR, RPR      Date
   Official Court Reporter
24

25