| | | |
|---|---|---|
| United States District Court | | Southern District of Texas |

United States District Court
Southern District of Texas
**ENTERED**
December 31, 2016
David J. Bradley, Clerk

| | | |
|---|---|---|
| Aetna Life Insurance Company, | § § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-12-1206 |
| Humble Surgical Hospital, LLC, | § § § | |
| Defendant. | § § | |

# Opinion on Debt and Truculence

1. *Introduction.*

   A hospital waived patient fees and paid kickbacks to referring physicians. In three years it billed more than $86.2 million to an insurer. Because the hospital's dishonest bills and illegal payments tricked the insurer into overpaying claims, the insurer can elect to take one of three remedies.

2. *Background.*

   Humble Surgical Hospital, LLC, is a five-bed hospital in Humble, Texas. Since it opened in August 2010, it has collected over $41.4 million from Aetna Life Insurance Company for services to Aetna members.

   A. *Plans.*

   Aetna insures patients through an array of plans that vary broadly in cost and coverage. All of the plans have three things in common: (a) the insurer pays a portion of the patient's bill; (b) the insurer pays a smaller portion when the patient uses a hospital with which the insurer does not have a fee schedule; and (c) the insurer does not pay when a hospital waives the patient's share.

In-network healthcare providers contract with Aetna to serve patients at agreed prices; out-of-network providers do not. A patient who seeks care from an out-of-network hospital pays more out of his pocket than if he had used an in-network hospital. Aetna does not have a relationship with Humble; it is outside of Aetna's network of hospitals. Humble charges a lot more than a hospital in Aetna's network would.

B.   Scheme.

Humble is a five-bed, out-of-network hospital that set its prices comparable to major Houston hospitals. In fact, it used Memorial Hermann in the Medical Center with 3,803 beds as its standard. Because no economically rational patient would choose it over an in-network provider, Humble paid referral fees to doctors, waived patient costs, and submitted inflated bills to Aetna.

Humble was joined by 103 doctors through a written proposal – printed in four colors – that offered them thirty percent of facility fees it collected from Aetna in exchange for referrals. Each doctor paid Humble only $3,500 in yearly "administrative and investment fees" – not a contribution of capital – to be entitled to the kickbacks.

To hide the referral-fee arrangement, the doctors created their own limited liability companies – shell entities. Humble agreed with the shells that they would pretend to assume Humble's billing responsibilities. Then they would do nothing, giving Humble and its affiliate, K&S Consulting, LLC, (a) control of billing and payments, and (b) five percent of the fees collected from Aetna. K&S Consulting would charge Aetna – identifying only Humble as the provider – and Aetna would pay the allowed amounts on each bill into Humble's bank account. Humble would kick back to the shells thirty percent of the facility fee paid by Aetna. In sum, Humble got seventy percent and the doctors got thirty percent.[1]

Humble also promised patients (a) that their out-of-pocket expenses would be equal to or less than in-network, and (b) possibly a refund if their insurer paid in full. Without disclosing the illegal conditions under which it agreed to treat patients, Humble submitted claims. Aetna processed and paid them based on Humble's certification that each one was "true, accurate, and complete."[2]

---

[1] See the Appendix.

[2] UB-04 Uniform Bill.

Aetna sues Humble for (a) money had and received, fraud, and negligent misrepresentation, and (b) relief under the Employee Retirement Income Security Act. The court now addresses the claim for money had and received.[3]

3. *Money Had and Received.*

A case for money had and received looks solely to whether the defendant holds money that belongs to the plaintiff. Aetna must show that Humble has been paid money that – in equity – belongs to Aetna.[4]

    A. *Assignments.*

As an out-of-network provider, Humble is only entitled to a patient's benefits through an assignment.[5] Despite having obtained assignments for its services only, Humble testified that the shells actually performed the services for which Aetna paid. No assignments exist from the patients to the shells, and Humble has no assignments from the shells to bill and collect for their services. The shells are not licensed; had they assigned any claims to Humble, the assignments would have been void for their multifaceted illegality.[6]

Without an assignment, Humble has no right to be paid under Aetna's contracts with the patients. Aetna will recover $41,411,650.98 from Humble for overpayments from August 2010 through October 2013 – an amount that Humble concedes.

---

[3] 1 J. Pomeroy, Equity Jurisprudence §§ 108, 174 (5th ed. 1941).

[4] 3 J. Pomeroy, Equity Jurisprudence §§ 869, 910 (5th ed. 1941); Staats v. Miller, 243 S.W.2d 686, 687 (Tex. 1951); City Bank of Hous. v. First Nat. Bank of Hous., 45 Tex. 203, 217-18 (1876).

[5] Harris Methodist Fort Worth v. Sales Support Servs., 426 F.3d 330, 333-34 (5th Cir. 2005).

[6] Morrison v. City of Fort Worth, 155 S.W.2d 908, 909 (Tex. 1941).

B. *In-network.*

Texas does not allow hospitals to bill patients one way and the plan another.[7] Humble is an out-of-network hospital, but it did not oblige patients to pay out-of-network amounts. Instead, it told patients that its services' costs would be equal to or less than at an in-network facility.

From August 2, 2010, to May 11, 2012, Humble submitted $68,626,126.71 of out-of-network claims, and Aetna paid $27,813,059.61. If Humble had billed Aetna the same way it told the patients it would – at in-network rates – Aetna would have paid $7,564,799.96.

Aetna will take $20,248,259.65 – the difference between what it paid Humble as an out-of-network provider from August 2, 2010, to May 11, 2012, and what it would have paid Humble as an in-network provider.

C. *Kickbacks.*

Humble tries to characterize its agreements with the unlicensed shells as leases for use of its hospital. Unlicensed entities cannot lease hospitals.[8] An entity that does nothing except cash checks does not need hospital space – it is a conduit. Humble's agreements with the shells are referral-fee arrangements, not leases.

Texas prohibits hospitals from paying doctors to refer patients.[9] Because Humble kicked back to the doctors thirty percent of its collections, Aetna is entitled to $12,423,495.29 – thirty percent of the $41,411,650.98 it paid Humble.

4. *Preemption.*

Aetna seeks to recoup money that it improperly paid because of Humble's fraud. Humble says that Aetna's claims attempt to enforce the plans with state law, improperly circumventing ERISA's enforcement provisions.

---

[7] Tex. Ins. Code § 1204.055; Tex. Occ. Code § 101.201.

[8] 25 Tex. Admin. Code § 133.21(c)(1).

[9] Tex. Occ. Code § 102.001(a).

Claims that seek to enforce the plans – like a plaintiff suing an insurer for denial of benefits – are covered by the Act. Aetna's claims do not seek to enforce the plans. Aetna wants to recoup the money Humble tricked it into paying for no benefit at all to the patients; the plans are merely the context of Humble's fraud.[10]

The Act does not give comprehensive regulations and procedures for all eventualities that might be tangentially related to a benefit plan. It is silent about overpayment by an insurer to a provider. Recourse to the common-law right to recover an insurer's overpayments does not interfere with the national scheme.[11] Aetna's claims are not preempted.

5. *Defenses.*

Humble has no defense.

A. *Voluntary Payment.*

Humble says that Aetna cannot recover because it knowingly paid what Humble charged it when it could have contested those payments. Humble misunderstands Aetna's claim. Aetna does not claim merely that Humble overcharged. It says that Humble overcharged it and (a) did not charge patients as the plans required, (b) did not provide the services for which it was billing, (c) had no assignments from the shells, and (d) paid kickbacks to referring doctors.

Because Aetna had no knowledge of these facts and never led Humble to believe that its bills would not be challenged if they turned out to be false, the voluntary payment rule cannot apply.[12]

B. *Accord and Satisfaction.*

Humble has not shown that Aetna disputed the bills, and intentionally agreed to relinquish any claims it might have had against Humble for its overcharges.[13]

---

[10] Trs. of AFTRA Health Fund v. Biondi, 303 F.3d 765, 779 (7th. Cir. 2002).

[11] Geller v. Cty. Line Auto Sales, Inc., 86 F.3d 18, 19-23 (2nd Cir. 1996).

[12] Miga v. Jensen, 299 S.W.3d 98, 103 (Tex. 2009).

[13] Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 863 (Tex. 2000).

Aetna never released its right to seek a refund from Humble on any claim. In fact, Humble expressly agreed that all payments by Aetna are subject to the patients' policy and Aetna was not guaranteeing any payment.[14]

C.  *Unclean Hands.*

Aetna's hands are clean. Humble is filthy up to the elbows from lies and corrupt bargains.

D.  *Express Contract.*

Humble says that because it is an assignee of the patients' benefit plans, Aetna's right to a refund is barred by the express contract rule. The plans do not cover overpayments to a provider much less claims tainted by illegal inducements that lured patients and doctors.[15]

As explained, Humble has no assignments from patients. Even if it did, overpayments under a contract can be recovered under a theory of restitution or unjust enrichment.[16] Aetna's claims are not eliminated.

6.  *Sanctions.*

Assuming Aetna's motion for judgment was not meritorious, Humble's answer and counterclaims would be struck. From the beginning Humble has been recalcitrant and obstreperous. Through six sets of lawyers, countless orders, hearings, and conferences, Humble's behavior has ranged from openly defiant to evasive – always feigning compliance. The court has admonished Humble time and time again. These points are illustrative:

> A.  Humble refused to comply with the court's orders to produce. A year later, when threatened with contempt, Humble finally produced some of its records, despite claiming that it had complied all along.

---

[14] Dkt. No. 209-12, Exhibit 6.

[15] 1 S. Williston, A Treatise on the Law of Contracts § 1:6 (4th ed. 1990); Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 683-84 (Tex. 2000).

[16] Sw. Electric Power Co. v. Burlington N. R.R. Co., 966 S.W.2d 467, 469-70 (Tex. 1998).

B.  In an effort to deliberately obstruct discovery, Humble removed from its papers "some of the references to use and co-management agreements in the summary as it would be prepared for Hughes."[17]

C.  Only after Aetna collaterally discovered in related litigation Humble's use agreements did Humble admit it had them.

D.  Though it finally capitulated and produced what was ordered, Humble restricted access to its papers by using the court's order on confidentiality improperly – Humble designated all of its papers for attorneys only without determining whether the restriction was proper. It then blamed Aetna and sought sanctions against it for violating the confidentiality order.

E.  Unhappy with the court's denying it relief, Humble surreptitiously sought to re-litigate the issue by suing in Connecticut[18] and unjustifiably seeking to intervene in a proposed class action in New Jersey.[19]

This case has had a tortured existence, and the bulk of the activity has been trying to force Humble to tell the truth. Humble has conducted guerrilla warfare against this court, Aetna, the patients, and common decency.

Humble has been repeatedly warned about its conduct. It has been given the opportunity to reform and has not done so. Its answer and counterclaims are struck as a consequence of its malfeasance.

---

[17] Dkt. No. 260-1, Exhibit A.

[18] Humble Surgical Hosp., LLC v. Aetna Life Ins. Co., No. 13-1903 (D. Conn. filed Dec. 17, 2013).

[19] TRI 3 Enters., LLC v. Aetna, Inc., No. 11-3921 (D. N.J. filed May 16, 2011).

7. Conclusion.

Hospitals that obtain patients through illegal remuneration to them or their doctors may not be paid under the plans. At its election, Aetna will take from Humble:

- A. $41,411,650.98 – the amount Aetna paid Humble from August 2010 through October 2013;

- B. $20,248,259.65 – the difference between what Aetna paid Humble as an out-of-network provider from August 2, 2010, to May 11, 2012, and what it would have paid Humble as an in-network provider; or

- C. $12,423,295.29 – the thirty percent kickbacks paid by Humble with Aetna's money.

Signed on December 31, 2016, at Houston, Texas.

Lynn N. Hughes
United States District Judge

# Appendix      Fund Flows
# Aetna v. Humble Surgical Hospital

